[Civ. No. 9177. First Appellate District, Division Two.—January 24, 1934.]

FRANK MOLLES, Respondent, v. DOLLAR STEAMSHIP LINES, INC., LTD. (a Corporation), Appellant.

Redman, Alexander & Bacon and Herbert Chamberlin for Appellant.

Joseph A. Brown for Respondent.

STURTEVANT, J.—From a judgment based on the verdict of a jury awarding damages for personal injuries the defendant has appealed and has brought up typewritten transcripts. It makes several points, among others, that the record does not show the defendant was negligent, but that it does show the plaintiff was negligent and that he assumed the risk out of which the injury occurred. In its opening brief the defendant has made an extended statement of the facts. In his brief the plaintiff does not controvert any of the facts which to us seem material to a determination of the case. In this manner we gather the following:

Pier 44 in San Francisco was constructed and is owned by the state of California. It extends east from the Embarcadero and consists of two stories. The inside of the wharf is approximately 700 feet long and 103 feet wide. The center aisle of the lower floor extends the length of the wharf and is 33 feet wide and is fringed with posts a foot square. These posts have spreading supports at the upper portion and are surmounted with steel crossbeams upon which rest the joists of the upper floor, which is 18½ feet above the lower. For the purpose of conveying freight from the upper to the lower floor the wharf is provided with chutes, jointed near the middle, and equipped with ropes and tackle whereby, as occasion demands, they can be lowered to the floor in the center aisle or raised to a position where the lower section of the chute is virtually parallel with the level of the upper floor. Truckmen, employed by the consignees of freight, raise or lower these chutes to such levels as will accommodate their necessities and conveniences. The chute involved in the present case is approximately 250 feet east of the Embarcadero and is called chute number 2. It occupies a position 20½ feet north of the southerly extreme of the center aisle, and in this center aisle and to the south of the chutes, the state maintains and controls electric lights of 200-watt power at intervals of each 44 feet. These lights hang from the ceiling and below the floor joists and the top of the beams, but are a little above the bottom of the crossbeams.

In July, 1925, and pursuant to section 2524 of the Political Code, the preferential use of pier 44 was assigned to the Dollar Line by the state harbor commissioners, the commis-

sion retaining the right to assign the temporary use thereof to other lines when the Dollar Line was not exercising its preference. The equipment above referred to was then on the wharf, and the maintenance and repair thereof rested upon the state. When its ships are engaged in loading or unloading freight the Dollar Line augments the center line of lights with two additional lights—one on the north side and one on the south side of the wharf—with the lights 28½ feet apart. And when the chutes are in operation and Dollar Line freight is involved, employees of the Dollar Line on the second floor of the wharf "slide the cargo down the chute" to waiting truckmen who adjust and manipulate the chutes and who are employed by the consignees of freight.

The Bay Cities Transportation Company is engaged in the business of transporting freight across the bay by means of barges. It acts as an independent contractor. On the night of the accident the company had transported two barges of freight for the Dollar Line from east-bay points and was engaged in unloading the barges on the south side of the pier for shipment of the freight on the "President Coolidge"—a ship of the Dollar Line—which was docked on the north side of the pier. As the freight came off the barges, employees of the Bay Cities Transportation Company deposited it on the wharf on movable frames of wood, called platforms or flats, and then small gasoline and electric trucks, called jitneys and owned by the company, would pick up the platforms and sort the freight by distributing it to places designated on the wharf according to its destination and the freight manifest. The jitneys were equipped with appropriate appliances for picking up the platforms, and were so constructed that in operating them the driver was required to stand upright on two pedal-like appliances in front of the motor, and to face the load he was transporting. Some eighteen employees of the company were engaged in this work of unloading, sorting and distributing the freight under the supervision of Charles Jones, its barge clerk, and he in turn co-operated with Joseph Brolan, the receiving clerk of the Dollar Line. In the course of this work no freight was deposited in the center aisle or within 20 feet south of chute number 2, but freight was deposited by the Bay Cities Transportation Company within 20 feet north of

the chute. The work had been in progress approximately four hours when plaintiff was injured and during that period the lighting on the wharf was adequate to enable the barge clerk of the company and the receiving clerk of the Dollar Line to read a typewritten manifest at all places on the wharf and to check the names and addresses on the various boxes of freight. The lighting was also sufficiently adequate to enable the employees of the company to perform their work of unloading, sorting and distributing the freight.

Plaintiff was an employee of the Bay Cities Transportation Company and had worked around pier 44 for seven years, and had operated a jitney for about six years. He came on duty about midnight of December 30, 1931, and in the four hours following operated a jitney in picking up platforms and distributing freight at different places on the wharf. He experienced no difficulty in seeing what he was doing during that period. About 4:15 in the morning plaintiff, while operating a jitney, endeavored to pick up a platform to the west of chute number 2 for the purpose of taking it to his fellow employees to be unloaded. His endeavor was unsuccessful for the reason that he had approached the platform with his jitney at an angle thereto, thereby creating the necessity of adjusting his position so that the jitney would be straight with the platform. To accomplish that adjustment the plaintiff backed his jitney, and with his back to the direction in which he was going and without having previously taken the precaution to look in that direction he collided with chute number 2 after he had backed about six feet. The chute was then in a lowered position approximately seven feet from the floor, but the record is silent of evidence as to who lowered it or how long it had been lowered before the accident. In the area 184 feet long and 103 feet wide surrounding the chute there were 16 electric lights all illuminated. The nearest of these lights was seven feet west of the east end of the chute and four feet south of the chute, the light next nearest was 18½ feet west of the west end of the chute, and the distance of the other 14 lights from the west end of the chute varied from 38½ feet to 95 feet. According to the witnesses for the defendant the chute was visible on the wharf from any point on the wharf. Witness Terrell, who was working with the plaintiff at the time and who appeared in his behalf,

testified that when he looked he could see the chute from a distance of 15 feet. Witness Porter, who was also working with the plaintiff and who also appeared in his behalf, testified that he knew the chute was down five or ten minutes before the accident, and that he could see it was down for a distance of over 15 feet. Defendant's witness Jones, barge clerk of the Bay Cities Transportation Company, testified that on the night of the accident and prior to its occurrence he had warned the plaintiff to be careful and not go under the chute. Witness Jones and defendant's witness Surratt, operating manager of the Bay Cities Transportation Company, both testified that after the accident plaintiff admitted he knew the chute was down, but had forgotten about it and had run into it. Plaintiff denied such warnings or admissions, but to excuse his conduct claimed that he did not know the chute was down, and that when it was not being operated it was usually raised. It is conceded that the chute was not in operation at the time of the accident. There was no evidence that the chutes were defective, that they were improperly installed, nor that when one was not being used any duty rested on the defendant to immediately enter the premises, raise the chute, and secure it.

From the foregoing facts it is clear that at the time of the accident the wharf where it happened was a place actively engaged in shipping, and at the same moment it was being used for storing. That such a place under such conditions, when conducted with ordinary care may, nevertheless, present conditions of danger, will be conceded. However, there is no legal standard defining ordinary care in the operation of such a place. We think it follows that in the absence of evidence to the contrary it may not be said the mere fact a chute is left partly down is negligence. (*Long* v. *John Breuner Co.*, 36 Cal. App. 630, 638 [172 Pac. 1132]; *Roach* v. *Wells Fargo Bank & Union Trust Co.*, 102 Cal. App. 380 [282 Pac. 967].) Nor, under the facts was the act of omission or commission the act of the defendant, as the use, operation and adjustment of the chutes were, for the time, in the hands and management of the plaintiff's employer and its agents. But whatever the liability of the plaintiff's employer may be, this defendant was not liable. (*Boswell* v. *Laird*, 8 Cal. 469, 493 [68

Am. Dec. 345].) If plaintiff's employer desired to use the chutes it was at liberty to do so. If it did not desire to use any particular chute, but desired to operate beneath, it was at liberty to raise the chute, if down, and fasten it in place. If it was not down the same party had the right to examine the fastenings to the end that the laborers might safely work thereunder. But, under the facts, no one of these duties rested on the defendant. This defendant is not liable for the acts of strangers who left the chute hanging halfway down. In *Olson* v. *Whitthorne & Swan,* 203 Cal. 206 [263 Pac. 518, 58 A. L. R. 129], the court was considering a set of facts involving an injury caused by a swinging door. The principle would seem to be the same as to a hanging door or a chute. Commencing on page 208 the court said: ''Swinging doors in buildings and stores are installed and maintained for the accommodation of those who have occasion to enter such building. The operation of such doors is not within the exclusive control of the owner of the building or proprietor of the store. Customers and patrons take a very distinct part in their operation and are chargeable with the exercise of ordinary care in their use. Injury may occur in their operation from a lack of such care on the part of the persons who use them, and for whose negligence the owner or proprietor would be in no wise responsible. In the present case the injury to the plaintiff may have been caused by the negligent operation of the lefthand door shown by the evidence to have been hurriedly used by the third lady when it rebounded and struck the plaintiff (*Smith* v. *Johnson,* 219 Mass. 142 [Ann. Cas. 1916D, 1234, L. R. A. 1915F, 572, 106 N. E. 604]; *Pardington* v. *Abraham,* 93 App. Div. 359 [87 N. Y. Supp. 670], affirmed in 183 N. Y. 553 [76 N. E. 1102]), or it may have been caused by the plaintiff's own negligent use of the righthand door.''

 The fact that it was night-time and that the lighting conditions were insufficient did not change the rule. The conditions that then existed were as well known to the plaintiff as to the defendant. Under those circumstances there was no duty resting on the latter to warn by sign, light or other method of possible dangers. (*Mautino* v. *Sutter Hospital Assn.,* 211 Cal. 556, 561 [296 Pac. 76].)

In view of what has been said it is unnecessary to discuss other points made by the defendant.

The judgment is reversed.

Nourse, P. J., and Spence, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 22, 1934.